J-S08008-26

J-S08009-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BENJAMIN AMPARO | : | |
| | : | |
| Appellant | : | No. 787 EDA 2024 |

Appeal from the Judgment of Sentence Entered January 12, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003870-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BENJAMIN AMPARO | : | |
| | : | |
| Appellant | : | No. 1796 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 12, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003889-2018

BEFORE: PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED MAY 7, 2026**

Benjamin Amparo appeals from the judgment of sentence imposed on January 12, 2024, for his convictions of two counts each of endangering welfare of children ("EWOC") and unlawful contact with minor, and a single count each of criminal attempt to commit indecent assault and indecent

assault.[1,2] Amparo challenges the sufficiency and weight of the evidence. We affirm.

The trial court set forth, in detail, the relevant factual and procedural history:

### Statement of Facts

In January of 2018, C.A.—[Amparo's] daughter—disclosed to her mother, [("Mother")], that [Amparo] had initiated sexual contact with her on two (2) previous occasions: the first in Willow Grove, Pennsylvania when C.A. was eight (8) years old, and the second in Philadelphia, Pennsylvania when C.A. was twelve (12) years old. [Mother], in turn, informed C.A. that [Mother's] other daughter and C.A.'s older half-sister, N.F., had reported a similar incident to [Mother] when N.F. was six (6) years old. After disclosing to N.F. [Amparo's] sexual advances toward C.A., the three (3) women decided to report the incident and gave statements to Special Victim's Unit (SVU) and Philadelphia Children's Alliance (PCA). [Amparo] was subsequently arrested and charged … .

At trial, the Commonwealth presented three (3) witnesses as part of its case-in-chief: N.F., C.A., and [Mother]. [Amparo's] trial counsel presented two (2) witnesses as part of [Amparo's] case-in-chief: K.Q.1 and K.Q.2. Additionally, several stipulations were made by and between the Commonwealth and [Amparo's] trial counsel. The trial evidence and testimony given at trial are summarized below.

a. N.F.

The first witness for the Commonwealth was N.F., who testified to an incident that took place in Philadelphia when she was six (6) years old. N.F. testified that, between the ages of six (6) and eleven (11), she lived in Philadelphia with her mother, [Mother],

_____

[1] We consolidate these two cases for ease of disposition as trial was held jointly and the same issues have been raised in each appeal.

[2] 18 Pa.C.S.A. §§ 4304(a)(1), 6318(a)(1), 901(a), and 3126(a)(7), respectively.

and [Amparo]. N.F. recalled that [Mother] and [Amparo] had been in a romantic relationship for over a year prior to the incident, and that [Mother] was pregnant with C.A.—N.F.'s younger half-sister, and [Amparo's] daughter. N.F. also recalled that, at the time of the incident, the three (3) lived in a three (3)-bedroom apartment, and that her own bedroom did not have a bed. As such, N.F. slept in the bed between [Mother] and [Amparo].

N.F. testified to a night when she was abruptly woken up by the sensation of [Amparo's] hands inside of her underwear. She testified that she felt [Amparo's] fingers "doing circular motions" around her vagina and clitoris area and felt his fingers "inside the labia" or "lips" of her genital area. N.F. characterized the encounter as "very uncomfortable," and "very scary." In response to [Amparo's] advances, N.F. pushed [Amparo's] hands away and wrapped herself in a "cocoon" with her blanket where she remained until she fell asleep. N.F. testified that she, at first, did not alert [Mother], who remained sleeping for the duration of the encounter. The following night, after displaying signs of reluctance to come to bed, N.F. informed [Mother] that [Amparo] had touched N.F. the previous night and that she did not want to sleep next to him again.

N.F. testified that [Mother] responded by confronting [Amparo] about the incident, having N.F. sleep on the outside of the bed nearest [Mother] instead of between [Mother] and [Amparo], and, eventually, supplying N.F.'s room with a bed where N.F. would later sleep for the remainder of the time she lived in Philadelphia. N.F. recalled that, approximately five (5) years later, when she was eleven (11) years old, she moved to New Jersey and, thereafter, saw [Amparo] "only in passing." Though N.F. stated that she and [Amparo] did not have a "good relationship," she confirmed that there were no subsequent instances of [Amparo] touching N.F., and she did not report the incident to the authorities for several years.

N.F. emphasized that the foregoing incident with [Amparo] was her first sexual encounter. However, N.F. testified that another sexual encounter took place between N.F. and two (2) of her cousins, during a summer trip to Panama. N.F. described this encounter as follows: "amongst me and two of my other cousins, we … touched each other inappropriately." N.F. recalled two (2) other sexual encounters involving "inappropriate touching" that

took place sometime after N.F. turned seven (7), between N.F. and K.Q.2—a cousin of N.F.'s younger sister, C.A.

When N.F. was nineteen (19) years old, [Mother] informed N.F. of a then-recent incident where [Amparo] had inappropriately touched C.A. After learning that C.A. wished to press charges, N.F. accompanied C.A. to Special Victims Unit (SVU) on April 19, 2018. At SVU, both N.F. and C.A. gave statements detailing the incidents of inappropriate touching that each had experienced from [Amparo].

b. C.A.

The second witness for the Commonwealth was C.A., [Amparo's] daughter and N.F.'s half-sister, who testified that [Amparo] inappropriately touched her on two (2) occasions. The first occurred in Willow Grove, Pennsylvania when C.A. was eight (8) years old. C.A. testified to sleeping, one (1) night, on an air mattress with [Amparo], during one (1) of her monthly visits to see her family in Willow Grove. The following morning, C.A. woke to find [Amparo's] hands "under her underwear," and "laying on top of her vagina." C.A. testified that she removed [Amparo's] hands from her person, went to an upstairs room in the home, and informed her cousin, K.Q.2, of the incident. C.A. explained that, K.Q.2, who was ten (10) years old at the time, "brushed … off" the incident. As a result, and due to C.A.'s fear that "nobody would believe her" regarding the incident, C.A. neither reported the incident to an adult nor spoke with [Amparo] about the incident.

The second incident occurred in [Amparo's] house on Loudon Street in Philadelphia when C.A. was twelve (12) years old. C.A. testified that, for Thanksgiving of 2017, she visited the Loudon Street house for a large family gathering. C.A. recalled going to bed early on account of "not feeling well" one (1) night. C.A. also recalled that [Amparo] directed C.A. to sleep in [Amparo's] bed instead of … one (1) of C.A.'s cousins as she normally would.

At approximately 1:00 a.m., C.A. woke to find [Amparo's] hand underneath C.A.'s shirt, touching her stomach. C.A. testified that [Amparo's] hand first began moving upwards, toward her breast area. [Amparo's] hand then began moving downwards, toward her waistline, attempting to get under her pants. Before [Amparo] could get his hand under her underwear, but after he had already

touched the "top" of C.A.'s vagina, C.A. turned her body over, facing the wall opposite from [Amparo], and pretended to be asleep until [Amparo] left the room. Not wanting to confront [Amparo] about the incident, C.A. continued to pretend that she was sleeping until [Amparo] reentered the room and fell asleep. Once C.A. confirmed that [Amparo] was asleep, she left the room and slept for the remainder of the night on a couch downstairs.

For fear of not being believed and being separated from her family, C.A., initially, did not report the incident to an adult. However, in January of 2018, C.A. informed [Mother] of the incidents while the two (2) were traveling back to Philadelphia to see [Amparo]. [Mother] assured C.A. that she believed the allegations and informed C.A. of the incidents that had occurred, years ago, with N.F. C.A. testified that she was unaware of the incidents with N.F., and that neither she nor N.F. had disclosed either's instances of abuse to the other, prior to January of 2018. C.A. testified that N.F. met with her and [Mother] and decided to report the incidents to the police. The three (3) filed a police report in Philadelphia and C.A. gave statements detailing the incidents to both SVU and the Philadelphia Children's Alliance.

c. [Mother]

The third and final witness for the Commonwealth was [Mother], who testified to receiving reports, from both N.F. and C.A., of incidents of abuse from [Amparo], and encouraging and assisting both in reporting the incidents to the authorities. [Mother] testified that she and [Amparo] were in a romantic relationship for approximately seven (7) years and had one (1) child together— C.A. [Mother] also stated that she had another daughter, N.F., who was several years older than C.A., and whose father was not [Amparo]. [Mother] testified that, when N.F. was six (6) years old, she, N.F., and [Amparo] lived together in Philadelphia. [Mother] recalled that, because the three (3) had recently moved to Philadelphia, N.F. did not initially have a full bedroom ready. As such, N.F. slept in between [Mother] and [Amparo] on a California, king-sized bed.

[Mother] testified that, the following night, N.F. resisted [Mother's] requests for N.F. to go to bed as usual, and informed [Mother] that [Amparo] had touched her "in her vagina," the previous night. That same night, [Mother] confronted [Amparo] about the incident, asking him what happened and why N.F. was

saying that [Amparo] had touched her. [Amparo] denied the allegations and claimed that his touching of N.F. was an "accident." However, [Mother] testified that she believed N.F. and took steps to physically keep N.F. away from [Amparo], including sending N.F. to spend more time with her biological father and his family and having N.F. sleep in the bed on the other side of [Mother] until N.F.'s bedroom was furnished with a bed of her own.

[Mother] stated that she feared reporting the incident to police due to [Amparo's] status as a professional boxer and the fact that [Amparo] had family in Philadelphia unlike [Mother], who was pregnant at the time of the incident with C.A. [Mother] explained that, at the time, she felt that she "didn't have any other place to go," though she expressed that "it was always in her mind to get out of that relationship." [Mother] testified that she was eventually able to do so after five (5) years, which resulted in N.F., C.A., and herself moving to New Jersey in March of 2011.

Though she and her two (2) daughters continued to live in New Jersey, [Mother] wished [Amparo] to be an active father in C.A's life and often brought C.A. to Philadelphia to see [Amparo] and participate in gatherings, holidays and events with [Amparo's] side of the family. In 2018, as [Mother] was driving C.A. to Philadelphia for one (1) such event, C.A. prompted [Mother] to stop the car, and informed her that [Amparo] had "put his hands under her pants," and that she did not want to see him. C.A. further expressed fear that no one would believe her regarding the incident. [Mother], however, assured C.A. of the "value" of her word and insisted that she believed her.

[Mother] then informed C.A. of the prior incident with N.F., which she and N.F. had both refrained from telling C.A. After discussing the incidents, C.A. indicated that she wanted to go to the police. Thereafter, [Mother] brought both of her daughters to SVU in Philadelphia and offered a statement herself. [Mother] testified to confronting [Amparo] over the phone, days after C.A. reported the most recent incident to her. [Mother] further stated that, despite subsequent attempts by [Amparo] to contact her, this was the last time she spoke to [Amparo].

At the close of [Mother's] testimony and the Commonwealth's case in chief, the Commonwealth and [Amparo's] counsel stipulated that [Amparo] was born on December 9, 1967, making

[Amparo] over the age of eighteen (18) at the time all of the foregoing incidents occurred. Furthermore, both counsels stipulated that, should Jesus Amparo testify at [Amparo's] trial, he would testify that [Amparo] has a reputation for being a law-abiding and nonviolent person.

d. K.Q.1

The first witness to testify for [Amparo] was K.Q.1, [Amparo's] niece and C.A.'s younger first cousin. K.Q.1, who was nineteen (19) years old at the time of [Amparo's] trial, testified to having lived in Willow Grove, Pennsylvania since at least November of 2017. K.Q.1 recalled a period of time, after [Amparo] and C.A.'s mother separated, when [Amparo] lived with K.Q.1 and her family, and C.A. visited every weekend. When K.Q.1 was in the seventh grade, [Amparo] moved to his home on Loudon Street in Philadelphia. K.Q.1 testified that she would often see C.A., who K.Q.1 characterized as her "best friend," and described as a "very family-oriented person," at [Amparo's] home.

K.Q.1 testified to one (1) occasion where she saw and interacted with C.A., in addition to several members of her family, during a Thanksgiving Day celebration in 2017. K.Q.1 recalled almost every member of the family, including [Amparo] and C.A., spending the night at [Amparo's] Loudon Street home following the celebration. K.Q.1 stated that she slept in a bed with her mother, father, and sister, while C.A. shared a bed, in a separate room, with [Amparo]. K.Q.1 claimed that C.A. came into her room the following morning, in what K.Q.1 described as a "laughing mood," and stated the following: "I was sleeping in the room with my dad, and he swung his arm over and I felt, like, his arm touched my boob." K.Q.1 further claimed that C.A. did not seem upset or troubled by what she was describing, and that the two (2) never talked about the incident again. K.Q.1 testified that she, herself, never disclosed the incident to anyone else.

K.Q.1 further testified that C.A. attended another "big family party" at [Amparo's] home on Loudon Street, which included another overnight stay, for Christmas in 2017. K.Q.1 claimed that C.A. seemed "completely normal" to her during this time. However, following the Christmas celebrations C.A. blocked her on all social media. Subsequently, K.Q.1 became aware of C.A.'s allegations of abuse against [Amparo] when the Philadelphia

Police Department contacted K.Q.1 and her mother to give statements regarding the incidents.

Over the next couple years, K.Q.1 attempted to reconnect with C.A., checking, periodically, to see if her social media accounts remained blocked by C.A. K.Q.1 testified that C.A. responded appropriately two (2) years after the Christmas celebration in 2017, and described her present relationship with C.A. as "pretty good." Additionally, K.Q. 1 stated that C.A. spends time with the whole family, though she no longer visits every weekend, and [Amparo] is never present during these visits.

e. K.Q.2

The second and final witness to testify for [Amparo] was K.Q.2— K.Q.1's elder sister, [Amparo's] niece, and C.A.'s elder first cousin. K.Q.2, who was twenty-one (21) years old at the time of [Amparo's] trial, testified that N.F. touched her "inappropriately," from the time she was able to form memories until she was about seven (7) or eight (8) years old. K.Q.2 testified that N.F used to play "games" wherein N.F. would kiss K.Q.2 and touch her on her breast area and in her vaginal area. K.Q.2 recalled that both K.Q.1 and C.A. were present during these incidents. K.Q.2 testified to knowing, at the time of these incidents, that no one should be touching her in this way, and to feeling "really disgusted" with herself as a result.

K.Q.2 testified that she learned of the allegations against [Amparo] and his arrest approximately one (1) year prior to [Amparo's] trial, at which point K.Q.2 informed her parents of the incidents of N.F.'s contact with her. K.Q.2 further testified that her mother gave a statement to SVU, and that she, herself, gave a sworn statement to police on October 14, 2023—approximately one (1) month prior to [Amparo's] trial. Additionally, K.Q.2 recalled that her parents spoke with [Mother] and N.F. regarding the incidents, and testified that, since reporting N.F.'s alleged contact, she has not seen N.F.

Procedural History

On December 29, 2021, the Honorable Judge Zachary Shaffer appointed Melissa Thomas as [Amparo's] trial counsel. On September 2, 2022, the Commonwealth filed a motion *in limine*, under the Tender Years Act, to introduce the out-of-court

statements of the two (2) complainants—N.F. and C.A. The Commonwealth amended its motion on September 27, 2022. On September 30, 2022, the defense conceded to the Commonwealth's Tender Years motion, and Judge Shaffer scheduled a jury trial to begin on October 5, 2022. [Trial was continued multiple times]. On September 27, 2023, [Amparo's] case was reassigned to the Honorable Judge Monica Gibbs. [Amparo's] case was reassigned a final time to [the Honorable Judge Charles A. Ehrlich ("trial court")] on November 8, 2023. Thereafter, [Amparo] waived his right to a jury trial, and a [bifurcated] waiver trial proceeded before [the trial court] … between November 8, 2023 and November 9, 2023.

At the outset of [Amparo's] trial, [the trial court] heard arguments from [Amparo's] counsel and the Commonwealth regarding [Amparo's] November 6, 2023 motion *in limine* to pierce rape shield and admit evidence of N.F.'s past sexual misconduct. Upon considering arguments from counsel as well as the relevant case law, [the trial court] granted [Amparo's] motion and permitted [Amparo's] counsel to admit testimony from K.Q.2 of alleged sexual abuse by N.F. against K.Q.2.

After hearing all testimony and closing arguments from the Commonwealth and [Amparo's] counsel, [the trial court] found [Amparo] guilty of indecent assault of a person less than thirteen (13), endangering welfare of children (EWOC), and unlawful contact with minor on docket number CP-51-CR-0003870-2018. [The trial court] also found [Amparo] guilty of [criminal attempt to commit] indecent assault of a person less than thirteen (13), EWOC, and unlawful contact with minor as to docket number CP-51-CR-0003889-2018. [The trial court] ordered a presentence investigation report and a mental health evaluation, and deferred sentencing to a later date.

[The trial court] subsequently held a sentencing hearing for [Amparo] on January 12, 2024. …

… [The trial court] sentenced [Amparo] to an aggregate term of six (6) to twenty-three (23) months of confinement, plus three (3) years of probation following [Amparo's] minimum term of confinement, and [ordered Amparo, upon parole, to be subject] to house arrest. At the conclusion of the hearing, the Commonwealth informed [Amparo] of the registration and

reporting requirements he was subject to under [SORNA II[3]], and [the trial court] set a surrender date for February 5, 2024.

… Through [his] newly appointed counsel, [Amparo] timely filed [a] post-sentence motion[] on January 22, 2024. In his post-sentence motion[], [Amparo] challenged the weight and sufficiency of the evidence for his convictions … on docket number CP-51-CR-0003870-2018. [Amparo] did not include challenges regarding any of this convictions on docket number CP-51-CR-0003889-2018 in his post-sentence motion[]. [The trial court] denied [Amparo's] motion[] at a hearing held on February 9, 2024. [Amparo] filed a timely notice of appeal to [this Court] on March 7, 2024, relating, once more, only to docket number CP-51-CR-0003870-2018.

On March 11, 2024, [the trial court] directed [Amparo] to file a [Rule] 1925(b) statement of errors complained of on appeal. [Amparo] filed a [Rule] 1925(b) statement … on April 2, 2024, which included only the docket number CP-51-CR-0003870-2018. In his statement…, [Amparo] challenged the weight of the evidence in addition to the sufficiency of the evidence to support [Amparo's] convictions … . On November 27, 2024, [the trial court] filed its [Rule] 1925(a) opinion regarding only the offenses on docket number CP-51-CR-0003870-2018, and relating only to victim C.A.

On March 7, 2024, [Amparo], through counsel, filed a timely petition pursuant to the Post-Conviction Relief Act (PCRA) to have his appeal rights pertain[ing] to docket number CP-51-CR-0003889-2018 reinstated *nunc pro tunc*. … On May 4, 2025, [Amparo] filed a second [] PCRA petition to have his right to file post-sentence motions regarding the case on docket CP-51-CR-0003889-2018 reinstated *nunc pro tunc*. [Amparo] amended his second PCRA petition on May 28, 2025, and [the trial court] granted [Amparo's] petition on May 29, 2025. On June 4, 2025, [Amparo] timely filed post-sentence motions on docket CP-51-CR-0003889-2018[,] which [the trial court] subsequently denied on July 3, 2025.

_____

[3] Sexual Offender Registration and Notification Act, 42 Pa.C.S.A. § 9799.11–9799.75.

On July 7, 2025, [Amparo] filed a timely notice of appeal to [this Court]. On September 4, 2025, [the trial court] directed [Amparo] to file a [Rule] 1925(b) statement … . [Amparo] filed a [Rule] 1925(b) statement … on September 20, 2025.

Trial Court Opinion, 10/20/25, at 1-13 (some formatting altered; unnecessary capitalization, brackets, ellipses, and record citations omitted).

The trial court authored its comprehensive Rule 1925(a) opinion addressing both cases on October 20, 2025. Both cases are now ripe for our review.

Amparo raises the following questions:

[1.] Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that [Amparo] committed the offense of:

a. Unlawful contact with minor (18 Pa.C.S.[A.] § 6318[(a)(1)]), specifically it was not proven beyond a reasonable doubt that [Amparo] had intentional contact with a minor in any of the offenses enumerated in Chapter 31 (relating to sexual offenses).

b. Endangering welfare of children (18 Pa.C.S.[A.] § 4304[(a)(1)]), specifically it was not proven beyond a reasonable doubt that [Amparo] engaged in a course of conduct that endangered the welfare of the complainant by violating a duty of care, protection or support.

c. Indecent assault against a person less than thirteen (13) years of age, under 18 Pa.C.S.[A.] § 3126[(a)(7)], specifically it was not proven beyond a reasonable doubt that [Amparo] had indecent contact with complainant, caused the complainant to have indecent contact with [Amparo], or intentionally caused the complainant to come into contact with seminal fluid, urine, or feces for the purpose of

> arousing sexual desire for [Amparo] or the complainant.

> [2.] Whether the verdict was against the weight of the evidence and could not sustain a conviction against [Amparo] and prove him guilty beyond a reasonable doubt of the three (3) counts of criminal conduct [Amparo] was convicted of[?] These charges are laid out in issue 1 above. The [verdict] was against the weight of the evidence for the following reasons:

> a. The lack of evidence of [Amparo's] actions being knowing or intentional.

> b. The lack of evidence that [Amparo's] actions were for the purpose of sexual gratification.

> c. The credibility concerns of the complaining witness including the inability to recall key details, prior statements, and prior actions.

> d. The conflicting testimony of multiple witnesses.

Appellant's Brief, at 4-5.[4]

> We begin with our well-established standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth

_____

[4] By order dated December 26, 2025, this Court accepted Amparo's brief filed at docket 787 EDA 2024 as filed at docket 1796 EDA 2025 because Amparo's brief at docket 787 EDA 2024 addressed both lower court dockets and a separate brief was unnecessary. **See** Order, 12/26/25 (single page).

may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Joseph*, 350 A.3d 1057, 1059 (Pa. Super. 2026) (citation omitted).

"Notably, the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." *Commonwealth v. Tepo-Martinez*, 349 A.3d 432, 435 (Pa. Super. 2025) (internal quotation marks and citation omitted). Furthermore, "physical evidence is not required for the Commonwealth to sustain its burden to prove a sexual offense." *Id.* (citation omitted).

Amparo argues both victims should not be believed. *See* Appellant's Brief, at 11-12. Amparo asserts that the contact was incidental with N.F., as "[a]rms move when one is sleeping." *Id.* at 11. He believes the evidence did not establish he sought sexual gratification when he touched N.F.'s vaginal area. *See id.* Regarding victim C.A., he claims the first incident, which the Commonwealth admitted at trial to show lack of accident, was simply C.A.'s imagination or a fantasy and did not actually occur. *See id.* As to the second incident, Amparo again argues the evidence established the contact was merely incidental. *See id.* at 12.

The Commonwealth responds that Amparo's argument is a weight claim couched as a sufficiency claim. ***See*** Appellee's Brief, at 13. Alternatively, the Commonwealth submits it presented sufficient evidence of each conviction because the contact was not incidental nor an accident. ***See id.*** at 14-18. We agree with the Commonwealth.

Amparo has failed to advance any argument that the evidence was insufficient. His arguments go to the weight of the evidence, not the sufficiency, because he is asserting the victims should not be believed. ***See Commonwealth v. Juray***, 275 A.3d 1037, 1043 (Pa. Super. 2022) ("[A] sufficiency of the evidence review does not include an assessment of credibility of testimony offered by the Commonwealth. Instead, such arguments are more properly characterized as challenges to weight of evidence.") (citations omitted). As such, his sufficiency claims are waived.

More importantly, we cannot agree that the evidence of the contact here showed that the contact was merely incidental. Therefore, even if the claims were not waived, they are meritless.

N.F. testified that she woke up to Amparo's hand under her underwear with Amparo's fingers doing circular motions around her vagina. ***See*** N.T. Trial, 11/8/23, at 30. C.A. testified that she woke up to Amparo's hand on her stomach, that it initially moved up towards her breasts, then moved down under her pants. ***See id.*** at 87-88. Before Amparo could get his hand under her underwear, C.A. turned away from him and Amparo removed his hand.

*See id.* at 88-89. Amparo immediately got out of bed and went to the bathroom. *See id.* at 89.

The testimony clearly establishes sufficient evidence for the jury to conclude that both contacts were intentional, not incidental or accidental acts that occurred because Amparo was asleep. We therefore find Amparo's first issue would not merit relief even if it were not inappropriately raised as a sufficiency claim.

Amparo's final claim asserts the verdict was against the weight of the evidence. Amparo makes the exact same argument here that he made regarding the sufficiency of the evidence. *Compare* Appellant's Brief, at 10-12 *with* Appellant's Brief, at 13-14. Amparo claims N.F. imagined or fantasized her claims against him. *See id.* at 13. He further argues the contact with C.A. was incidental because "people toss and turn when they are sleeping." *Id.* at 14.

This Court only reviews weight claims for an abuse of discretion:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. Additionally, this Court cannot substitute its credibility determinations for that of the factfinder or reweigh the evidence. Indeed,
>
>> when the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on direct review.

*Commonwealth v. Bernarsky*, 348 A.3d 304, 323 (Pa. Super. 2025) (quotation marks and citations omitted).

Here, the trial court explained why it denied the weight of the evidence claims after detailing the testimony provided by each victim. *See* Trial Court Opinion, 10/20/25, at 25-30. Based upon the evidence thoroughly described by the trial court, we discern no abuse of discretion. The jury was justified in finding that the incidents described by both victims were not merely incidental contact caused by Amparo rolling around while he was asleep. As discussed above, both victims described actions that clearly showed Amparo was awake and intentionally touching them for sexual gratification. The trial court therefore did not err in denying Amparo's claims that the verdict was against the weight of the evidence. As such, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>5/7/2026</u>